[No. 30408-9-I.   Division One.   August 29, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. RONALD LAMAR JACKSON, *Appellant.*

---

*Lorraine Lee* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Theresa Fricke, Senior Prosecuting Attorney,* for respondent.

COLEMAN, J. — Ronald Lamar Jackson appeals his conviction for one count of first degree robbery and one count of first degree burglary, arguing that the trial court erred by denying his motion for a new trial based on a juror's alleged racial bias and misconduct during voir dire. We reverse and remand for a new trial.

During late 1991, the State charged Jackson, who is African-American, with robbery in the first degree and burglary in the first degree. At trial Jackson defended the charges on an alibi theory. Prior to the jury voir dire, the trial judge made the following opening remarks:

> The whole purpose of jury voir dire examination is to make sure we get an impartial panel of 12 people to sit and listen and to try a case. And in this respect, we'll be asking questions of you. We are not trying to embarrass you in any way in asking our questions, nor are we trying to pry into your private affairs, but just to determine if you are unbiased and without any preconceived ideas which might affect the trial of the case.
>
> You should never withhold any information to be able to sit on any particular jury. You should be straightforward in your answers rather than in a manner that you think the attorney speaking to you wants you to answer.

Once a jury has been selected and accepted by all sides, you are expected to keep an open mind until this case is fully submitted to you and that you will accept the instructions of the Court and not be influenced by any other considerations.

The whole purpose of voir dire examination, as I indicated, is to determine if you have that frame of mind.

The trial judge then asked the prospective jurors general questions, including the following:

I realize you don't know very much about this case, but so much as you do know about this case, is there anything about this case thus far that would cause you to begin this trial with any feelings or concerns either one way or another; that is, either for or against the State of Washington, plaintiff, or for or against the defendant in this case? If so, please raise your hand.

Is there any juror that knows of any reason why he or she would not be able to try this case impartially? If so, please raise your hand.

No juror responded to the court's inquiries.

Both parties subsequently questioned the prospective jurors, including, in particular, juror X.[1] Juror X, who is white, indicated that he is a good judge of credibility and that he felt comfortable making credibility decisions. Defense counsel challenged no one for cause and used all six of his peremptory challenges. The final jury panel included juror X.

At trial, the State presented the testimony of two white witnesses, the victim and his friend, both of whom were acquainted with Jackson and identified him as having committed the crimes. In his defense, Jackson presented the testimony of five African-American witnesses, each of whom testified that they had seen Jackson either at the time or around the time the incident was said to have occurred.

On January 14, 1992, the jury convicted Jackson on both counts. Jackson moved for a new trial based on allegations of juror X's racial bias and misconduct. In support of the motion, Jackson submitted a certification from one of the jurors, Lenora Williams. Williams, who is African-American, stated as follows:

---

[1]We do not name the juror because he was not afforded an opportunity to deny or explain the statements or to rebut the inference of racial prejudice.

2. During the deliberations, I overheard a conversation between two of the jurors, the main person speaking was known to me as [X]. [X] was telling the other juror about a trip home recently to attend a reunion of some kind. Throughout the conversation [X] would make comments about "coloreds". It was clear from the surprised look on his face at the end of the conversation, as the jury was about to commence deliberations for the day, that [X] had not known that I was sitting next to him throughout the conversation.

3. Among the comments [X] made were statements such as: "There are a lot more coloreds now [at home] then [*sic*] there ever used to be." "The worst part of the reunion was that I had to socialize with the coloreds." "You know how those coloreds are." Though the exact words are not quoted here, the quotes given are substantially the same. The context of the comments made it clear that by "coloreds" [X] meant African-Americans.

Jackson argued for a new trial on the basis that juror X's comments revealed racial bias and that X had intentionally concealed his prejudice during voir dire. The State, in response, argued that there was no factual showing of juror misconduct and urged the court to deny the motion. The State also argued in the alternative that if the trial court was inclined to grant the motion, then it should first conduct an evidentiary hearing. The trial judge denied the motion for a new trial, stating as follows:

[A]s counsel may know . . ., I am Japanese, of Japanese descent, that is.[2] I have been called a Jap, which is disparaging and offensive to me. However, in some respects, in certain instances, I constitute that as ignorance on the part of the person using that term as opposed to being a racial slur as such. Depends on the context that it's used and how it's used. I would say that.

Now, I guess during World War II the term Jap, insofar as my ethnic background, was of common usage. It was used in the newspaper during World War II. In this respect, some of these newspaper terms, when they used the term Jap or names as such, it's not used to slur the Japanese but was then to denote who they were, as the enemy.

As I indicated — you may be seated, Mr. Acosta — 30 years ago my understanding — I'm not a student of derivative language or the English language as such — the term "coloreds" was also used to denote members of the Negro race. I would say 150 years ago the term "Nigger," which is now called racially prejudicial and denotes disparaging remarks about

---

[2]The trial judge in this case was the Honorable Richard M. Ishikawa.

people of African descent, was commonly used, I would think to denote people of African descent.

Evolution has indicated during this civil rights movement the term "blacks" was preferable. Even 50 years ago after the use of the term "Nigger" was denoting some disparaging remarks about the Negro race, the term "Negro" was used, I believe, to denote members of the black or African race.

And then we got into the civil rights movement in the early sixties, when the term "blacks" came into use to denote Negroes.

And a couple of years ago, or within the past year or two, we have come to the situation where Thurgood Marshall, in one of his opinions from the Supreme Court, said the term "blacks" shouldn't be used and that the term "African-American or Afro-American" should be used to denote members of the black race.

In this respect I have to go on what the certification has indicated. And one of the objections I see the defense making is the term or the use of the word "colored" that a juror used when he was talking with another member of the jury in the jury room.

Again, as I indicated before, it depends on what context the word "colored" is used, notwithstanding that a black or an African-American feels that it may be derogatory. That in itself does not denote, as I see it, bias or prejudice. And I use the same analogy that I used in regard to members of the Japanese race in terms of the use of the term "Jap" or "Japs." So the use of the term "coloreds" in itself, I feel, does not indicate bias or prejudice.

The statement about apparently a reunion from what I can gather from the certification, "There are lots more coloreds now [at home] than there ever used to be," does not indicate anything in regard to racial bias or prejudice or against Mr. Jackson in this case.

Again, the phrase or the statement, "The worst part of the reunion was that I had to socialize with the coloreds." He may have a preference in not associating with a minority race or ethnic background situation, but that does not indicate a racial bias or prejudice against Mr. Jackson in this case.

And the question of, "You know how these coloreds are," I don't know what that means and in what context it was taken. The question of stereotyping people of ethnic descent is unfortunate. However, that statement of "You know how these coloreds are" doesn't indicate bias or prejudice so as to overturn the verdict of a jury.

I might also indicate, if I were to read the certification of Ms. Williams on its face, I cannot find a bias or prejudice to overturn this verdict of the jury.

There's no question that during the course of the voir dire all of the jurors were asked by the Court whether there was

any reason why he or she would not be able to try this case fairly and impartially. And no one indicated any response to that question.

And I believe during the course of the voir dire defense counsel raised the question of whether or not they had any bias towards blacks or Afro-Americans or something in that nature. And no one indicated when that specific question was raised.[3]

The statements that are contained in the certification indicate or reveal, as I could see it, no sort of racial prejudice or bias against Negroes in general.

I don't condone the term "coloreds" as it stands as such in our time and state of how people of African-American descent wish to be denoted.

And I further find that such discussion, if there was such a discussion, and I have to take the certification as fact, indicates no desire by this juror whatsoever to convict Mr. Jackson because of his race.

And so I am going to deny the motion for a new trial under these circumstances.

Jackson's appeal followed.

The sole issue that we are asked to decide on appeal is whether the trial court abused its discretion by denying Jackson's motion for a new trial. Jackson contends that a new trial was warranted in light of juror X's failure to reveal his racial bias during voir dire. Alternatively, Jackson argues that even if juror X's actions did not constitute misconduct, he was nevertheless entitled to a new trial, as a matter of due process, given juror X's racial bias. Under the particular facts of this case, we hold that a new trial should have been granted.

Actual bias is defined by RCW 4.44.170(2) as follows:

[T]he existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging[.]

Under this definition, the issue of actual bias goes to whether a particular juror's state of mind is such that he or she can try a case impartially and without prejudice to a

---

[3]A review of the record reveals that this question was never asked during voir dire.

party. *Brady v. Fibreboard Corp.*, 71 Wn. App. 280, 283, 857 P.2d 1094 (1993), *review denied*, 123 Wn.2d 1018 (1994).

In this case, we disagree with the trial court's conclusion. We believe that the statements, taken as a whole, create a clear inference of racial bias. In particular, the statements reveal juror X's aversion toward associating with African-Americans and a predisposition toward making generalizations about African-Americans as a group. Presumptively, these statements demonstrated that juror X held certain discriminatory views which could affect his ability to decide Jackson's case fairly and impartially.

This case therefore raises a valid issue of juror misconduct. While the questions asked during voir dire could have been more specifically phrased to elicit a response regarding racial bias, *Gordon v. Deer Park Sch. Dist. 414*, 71 Wn.2d 119, 426 P.2d 824 (1967) supports the proposition that juror X should have revealed his feelings about African-Americans during voir dire. We do not, however, resolve this case on the basis of juror misconduct. Rather, we find that as a matter of due process, the trial court should have conducted an evidentiary hearing before ruling on Jackson's motion for a new trial.

Under Washington law, the right to a jury trial includes the right to an unbiased and unprejudiced jury. *State v. Parnell*, 77 Wn.2d 503, 507, 508, 463 P.2d 134 (1969). The failure to provide a defendant with a fair hearing violates minimal standards of due process. *Parnell*, at 507 (quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961)). As stated by our Supreme Court in *Parnell*: "[M]ore important than speedy justice is the recognition that every defendant is entitled to a fair trial before 12 unprejudiced and unbiased jurors. Not only should there be a fair trial, but there should be no lingering doubt about it." *Parnell*, at 508.

In general, it is preferable to resolve the question of juror bias during voir dire rather than through a postverdict motion for a new trial. When, however, this type of issue is raised postverdict and the moving party has made a prima

facie showing of bias, an evidentiary hearing is always the preferred course of action. Here, it is possible that the State could have rebutted the inference of racial bias through further inquiry at an evidentiary hearing. Had that approach been taken, then the parties would have had the opportunity to examine juror X, and the trial court could have made a determination based on its assessment of the juror's responses, credibility, and demeanor whether or not juror X, in fact, held a racial bias such that he could not have decided the case fairly and impartially. Moreover, through further inquiry, the parties could have examined other jurors about whether race played a role during their deliberations, and juror X would have had the opportunity to explain his statements and the context in which they were made.

The trial court, however, decided not to conduct an evidentiary hearing and, based only on the affidavit, denied Jackson's motion for a new trial.[4] In a case where the defendant was African-American, the defendant's alibi witnesses were African-American, and the ultimate outcome turned on credibility, this was error. An evidentiary hearing was the only appropriate course of action given Jackson's prima facie showing of racial bias. Accordingly, we hold that as a matter of due process, the trial court erred when it ruled on Jackson's motion for a new trial without having conducted an evidentiary hearing.

Approximately 2$^1$/$_2$ years have passed since Jackson was convicted. Given this passage of time and the associated difficulty of obtaining both juror witnesses and adequate recollections, coupled with the fact that we have not been asked to remand the matter for an evidentiary hearing in the event that we do not affirm,[5] we reverse and remand for a new trial.

---

[4]The fact that Jackson did not agree to an evidentiary hearing below does not constitute a waiver of his right to argue that he was denied the right to due process. Jackson was entitled to take the position that he had made a sufficient showing of racial bias.

[5]The dissent argues that there is no reason why the State would make such a request. Knowing, however, that Jackson requested reversal and that there was

Reverse and remand for a new trial.

KENNEDY, J., concurs.

BAKER, J. (dissenting) — I respectfully dissent.

The majority opinion reverses Jackson's conviction because the trial court did not hold an evidentiary hearing to explore the allegation that a juror was racially biased. Yet no error was assigned to the court's failure to hold such a hearing, nor does the Defendant argue this issue on appeal. It is not surprising that Jackson did not raise the issue on appeal, because when the State suggested such a hearing below, the defense attorney *objected* to a hearing.

In my opinion, the trial judge did fail to appreciate the degree of racial prejudice reflected in the remarks reported to have been made by juror X. Indeed, if such statements had been made by juror X during voir dire, I would be surprised if a challenge for cause were not sustained.[6]

The evidence of bias here was presented in support of a posttrial motion for new trial. The majority does not contend the evidence was irrefutable or so damning that it required a new trial *per se* regardless of whatever additional information might be developed at a hearing. Yet, inexplicably, the majority reverses Jackson's conviction on the sole basis that the trial judge failed to override the defense's objection to such a hearing.

Even on appeal, the Defendant does not request a remand for an evidentiary hearing. The majority blames the *State* for failing to suggest such a remand on appeal, but there is

a possibility that we would not affirm, we fail to understand why the State should not be expected to have made an alternative request for relief if that was an avenue that it wished to pursue. This was the approach that it took at trial and it seems likely that its decision not to request alternative relief on appeal was a conscious one in light of the difficulty of holding an evidentiary hearing $2^1/2$ years after the fact.

[6]Even at voir dire, however, the State would have had the right to inquire further of the juror to determine whether the showing of bias could be ameliorated such that a challenge for cause could be denied without committing reversible error.

no reason why the State would make such a request. Nor does that foreclose the issue from our consideration. Appellant bases his appeal solely on an argument that his showing of bias necessitates, *per se*, a new trial. The majority does not accept that argument, yet grants the relief requested. If a remand is required, I see no reason why an evidentiary hearing could not now be ordered.

Reconsideration denied October 5, 1994.

Review denied at 126 Wn.2d 1003 (1995).