FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 FEB -5 AM 9: 02

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| Respondent, | ) ) ) | DIVISION ONE |
| | ) | No. 75277-4-I |
| v. | ) ) | UNPUBLISHED OPINION |
| TOMAS MUSSIE BERHE, | ) ) | |
| Appellant. | ) ) | FILED: February 5, 2018 |
| | ) | |

DWYER, J. — Tomas Berhe was charged and convicted of murder in the first degree and assault in the first degree, each with a firearm enhancement. On appeal, Berhe contends that he was deprived of a fair trial based on racial animus among the jurors and flagrant prosecutorial misconduct. Berhe also contends that the trial court erred by permitting the State to admit evidence of statements that he made after invoking his right to remain silent, admitting ballistic evidence, and refusing to impose a sentence below the standard range. Finding no error warranting reversal, we affirm.

I

Shortly after midnight on July 22, 2013, Everett Williams was shot four times and killed while sitting in the front passenger seat of a parked vehicle. One bullet passed through Williams and struck the arm of Michael Stukenberg, who was sitting in the driver's seat of the vehicle. Several people in the surrounding area saw an individual flee the scene of the shooting in an automobile.

Police quickly matched the witnesses' description of the suspect vehicle with a vehicle driving erratically on the freeway, roughly 1.5 miles from the scene of the shooting. The individual sitting in the front passenger seat fit the witnesses' description of the shooter. Police pulled the vehicle over and detained the driver, Elijah Washington, and the passenger, Tomas Berhe. Police recovered a handgun from underneath the driver's seat.

Berhe was charged and convicted of murder in the first degree with a firearm enhancement and assault in the first degree with a firearm enhancement. The trial court polled the jury and each juror confirmed that the verdicts returned were the verdicts of the jury as a whole and the verdicts of that juror individually. The sentencing court imposed concurrent sentences of 300 months of confinement for the murder conviction and 113 months of confinement for the assault conviction. The sentencing court further imposed 60 months of confinement for each firearm enhancement, to be served consecutively. Berhe now appeals.

II

Berhe first contends that the trial court erred by permitting the State's ballistic examiner to offer opinion testimony during trial. Berhe asserts that ballistic testing is unreliable and scientifically dubious and that the expert's opinion was misleading and contrary to the underlying science.

In determining the admissibility of evidence based on novel scientific theories or methods, Washington courts employ the "general acceptance" standard set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). "The

Frye standard requires a trial court to determine whether a scientific theory or principle 'has achieved general acceptance in the relevant scientific community' before admitting it into evidence." In re Det. of Thorell, 149 Wn.2d 724, 754, 72 P.3d 708 (2003) (internal quotation marks omitted) (quoting In re Pers. Restraint of Young, 122 Wn.2d 1, 56, 857 P.2d 989 (1993)). "When a party fails to raise a Frye argument below, a reviewing court need not consider it on appeal." In re Det. of Taylor, 132 Wn. App. 827, 836, 134 P.3d 254 (2006). Moreover, particularly where evidence is based on a routinely used and "familiar forensic technique," an objection to that evidence must be sufficiently specific to inform the trial court that a Frye challenge is intended. State v. Wilbur-Bobb, 134 Wn. App. 627, 634, 141 P.3d 665 (2006).

"Once a methodology is accepted in the scientific community, then application of the science to a particular case is a matter of weight and admissibility under ER 702, which allows qualified expert witnesses to testify if scientific, technical, or other specialized knowledge will assist the trier of fact." State v. Gregory, 158 Wn.2d 759, 829-30, 147 P.3d 1201 (2006). "The qualification of an expert to give opinion testimony is a matter within the sound discretion of the trial court, and the trial court's determination will not be disturbed unless that discretion is manifestly abused." State v. Brown, 17 Wn. App. 587, 596, 564 P.2d 342 (1997).

Here, tool mark and firearms forensic scientist Kathy Geil testified on behalf of the State. Geil testified as to the procedure that she used to test the firearm recovered from the vehicle in which Berhe was detained. This procedure

involved test firing five bullets from the firearm and comparing the microscopic markings on the fired casings and bullets with those recovered from the crime scene. Geil testified that, after comparing the samples from her own test fired bullets to the bullets recovered from the crime scene, "I was able to see that they all had the same markings . . . I was able to identify them as having come—or as having been fired from this firearm."

During cross-examination, Berhe's counsel questioned Geil regarding the accuracy and scientific certainty of ballistic testing. Defense counsel asked Geil about the manufacturer of the firearm that was recovered by police. Counsel asked Geil if she knew how many firearms were produced by that same manufacturer. Geil did not know. Counsel then asked Geil whether it was possible that another firearm produced by that manufacturer could have similar microscopic irregularities as the firearm that was recovered by police. Geil stated that she had not examined every firearm produced by that manufacturer and therefore could not answer with certainty, but that she would assume that there would be some randomness in each firearm. Geil testified that she made her determinations based on her own experience.

Berhe's attorney then asked, "[Y]ou have told us that you cannot say with 100 percent certainty that these bullets and these cartridge cases, that it—you cannot say that it came from this particular gun to the exclusion of any other gun in the universe; you are not able to say that?" Geil replied, "Right. With a theoretical understanding that the worlds can collide, right. There is—

theoretically, I can't say to all exclusion to all other firearms, you know. We just haven't examined them."

On appeal, Berhe contends that ballistic testing is scientifically dubious and therefore unreliable. By so contending, Berhe "attempts to transform that which should have been raised as an evidentiary challenge in the trial court into a question of constitutional significance on appeal." In re Det. of Post, 145 Wn. App. 728, 755, 187 P.3d 803 (2008), aff'd, 170 Wn.2d 302, 241 P.3d 1234 (2010). But Berhe did not request a Frye hearing in the trial court and, thus, has not preserved such an evidentiary challenge for review. Post, 145 Wn. App. at 755-56 (citing Taylor, 132, Wn. App. at 836).

Berhe also contends that Geil's testimony was misleading because it presented ballistic testing as "definitive science." The nature of Berhe's contention is unclear. Again, Berhe never requested a Frye hearing or objected to the use of ballistic testing evidence. Neither did Berhe object to Geil's qualifications to testify as an expert witness on this subject. Indeed, Geil thoroughly explained the procedure behind ballistic testing and its limitations. Geil did not, as Berhe asserts, testify that there was an "absolute and scientifically determined match" between the firearm and the bullets recovered from the crime scene. To the contrary, Geil made clear that her opinion was based on her own experience and that she had not examined every firearm in existence and, therefore, could not definitively rule out the possibility that another firearm might be a match.

Finally, Berhe contends that the trial court erred by denying his motion in limine to prohibit Geil and the prosecutor from characterizing ballistic testing as "science." Berhe raises this contention for the first time in his reply brief and has not assigned error to a related trial court ruling. Accordingly, we decline to reach this issue. RAP 10.3; see State v. Hudson, 124 Wn.2d 107, 120, 874 P.2d 160 (1994) (appellate courts will not consider arguments raised for the first time in a reply brief); see also Valente v. Bailey, 74 Wn.2d 857, 858, 447 P.2d 589 (1968) (appellate courts will not consider alleged errors that are not set forth in the "assignments of error" section of the brief).

There was no error.

## III

## A

Berhe next contends that the trial court erred by admitting statements that he made to police after invoking his right to remain silent. We agree, but deem the error harmless.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution guarantee a criminal defendant the right to be free from self-incrimination. State v. Easter, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996); U.S. CONST. amend. V; WASH. CONST. art. I, § 9. This right prevents the State from using statements made by the defendant during a custodial interrogation unless the defendant was informed of his or her Miranda[1] rights. In re Pers. Restraint of Cross, 180 Wn.2d 664, 682, 327 P.3d 660 (2014). "Any

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

waiver of these rights by the suspect must be knowing, voluntary, and intelligent." State v. Piatnitsky, 180 Wn.2d 407, 412, 325 P.3d 167 (2014). "Even once waived, a suspect can invoke these rights at any point during the interview and the interrogation must cease." Piatnitsky, 180 Wn.2d at 412. "It is well established that Miranda rights must be invoked unambiguously." Piatnitsky, 180 Wn.2d at 413 (citing Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)). The inquiry is an objective one and asks whether "'a reasonable police officer in the circumstances would understand the statement to be [an invocation of Miranda rights].'" Piatnitsky, 180 Wn.2d at 413 (alteration in original) (quoting Davis, 512 U.S. at 459).

We review a trial court's erroneous admission of custodial statements for harmless error. Cross, 180 Wn.2d at 678. Constitutional error is harmless if we are "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result, despite the error." State v. Aumick, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995).

Here, Berhe was advised of his Miranda rights at the time of his arrest. Berhe was then transported to the homicide unit and was again read his Miranda rights. Berhe concedes that, at that time, he waived his right to remain silent by engaging the detectives in conversation. The entire interrogation was audio and video recorded.

Berhe was hostile toward the detectives during the interrogation. For example, Berhe refused to tell the detectives where he was coming from the night that he was arrested. When asked why he would not answer, Berhe

responded, "You guys don't understand, man. You guys do not understand this shit. I kept trying to be, you know, cooperative and everything and try to talk to those guys out there and they just kept treating me like shit. . . . So why the fuck should I be treating anybody else better?" Berhe refused to answer the detective's questions concerning who owned the vehicle that Berhe was a passenger in when police arrested him.

> BERHE: I already know both you guys' styles. I already know how you guys do this shit. Okay. So I'm not going to play this sick game with you guys anymore.
> WEKLYCH: Who owns the car?
> BERHE: It doesn't matter.
> WEKLYCH: It doesn't?
> BERHE: It doesn't matter. What if you own it? What the fuck.

The detectives persisted in questioning Berhe despite his uncooperative attitude. At one point during the interrogation, Detective Russell Weklych asked Berhe what he was doing the night that he was arrested.

> BERHE: What do you mean, what I—I don't even want to talk to you, dog. I don't even want to talk to you. I don't want to talk to you or you.
> WEKLYCH: Why are you so ticked off?
> BERHE: Because I don't like that fucking smirk you got on your face looking at me like that. I know you're up to some fucking fucked-up ass games and I already have a fucking history with you. So it doesn't matter. And I know that shit right there is recording, I don't care.
> WEKLYCH: Okay.
> BERHE: I don't care. You're not telling me what the fuck I'm here for. Those officers didn't tell me what the fuck I'm here for. But you're just going to come in here and question me and try to role play me along.
> WEKLYCH: What would you like me to do?
> BERHE: I would like you not to talk to me about shit and tell me what the fuck I'm here for. All you telling me is, oh, I'm investigating an incident. What incident?

The trial court held a CrR 3.5 hearing to determine if and when Berhe invoked his right to remain silent. The trial court concluded that Berhe had unequivocally invoked his right to remain silent when Berhe told the detectives, "I would like you not to talk to me about shit and tell me what the fuck I'm here for." Accordingly, the trial court concluded that all of Berhe's statements prior to that statement were admissible.

Berhe contends that he unequivocally invoked his right to remain silent earlier in the interrogation. Specifically, Berhe asserts that he invoked that right when he stated, "What do you mean, what I—I don't even want to talk to you, dog. I don't even want to talk to you. I don't want to talk to you or you."

Berhe is correct. Viewing Berhe's statements objectively, a reasonable police officer in the circumstances would understand that Berhe was invoking his right to remain silent by repeatedly stating, "I don't even want to talk to you." By ruling otherwise, the trial court erred.

Nevertheless, the trial court's error was harmless. The two erroneously admitted utterances were irrelevant to the crime and did not reveal any new information to the jury. Contrary to Berhe's assertions, the erroneously admitted statements did not introduce the jury to Berhe's character and temperament. Berhe was hostile, combative, and uncooperative throughout the duration of the interrogation. The admission of a few extra lines of similar dialogue did nothing to change that. The error was harmless.

B

Berhe also contends that the trial court erred by admitting the videotape recording of his interrogation. Berhe asserts that the video recording was not relevant, that its probative value was outweighed by the danger of unfair prejudice, and that the trial court should have so ruled. We disagree.

We review a trial court's decision to admit evidence for an abuse of discretion. In re Det. of Twining, 77 Wn. App. 882, 891, 894 P.2d 1331 (1995). A trial court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds or reasons. State v. Rodriquez, 187 Wn. App. 922, 939, 352 P.3d 200 (2015). A defendant's failure to object to the admission of evidence waives the issue on appeal. State v. Guloy, 104 Wn.2d 412, 421, 705 P.2d 1182 (1985).

Only relevant evidence is admissible. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "The threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. Unfair prejudice "is that which is more likely to arouse an emotional response than a rational decision by the jury." State v. Gould, 58 Wn. App. 175, 183, 791 P.2d 569 (1990).

Here, Berhe raises several vague contentions concerning the trial court's decision to admit the video recording of his custodial interrogation. Berhe asserts that (1) the video recording was not relevant evidence because he did not admit to anything during the interrogation, and (2) the video recording was unfairly prejudicial because it showed him being combative and hostile toward the detectives and because he indicated during the interrogation that he had past experience dealing with the police.

As a preliminary matter, it does not appear that Berhe objected to the admission of the videotape recording. In his brief, Berhe asserts that he "asked to exclude the video" recording but the citation to the record that he provides reveals no such request. Rather, the record indicates that Berhe merely objected to the admission of certain statements made during the interrogation (concerning Berhe's past experiences with the police). Those statements were edited out of the video recording and Berhe's counsel approved of the edits. Thus, Berhe received the remedy that he sought.

But even had Berhe objected to the admission of the video recording on the grounds that he now raises, his claim would still fail. First, the video recording did not need to show Berhe admitting to a crime before it could be deemed at least "minimally relevant" because it showed Berhe lying to detectives concerning several key matters. Second, although Berhe's demeanor during the interrogation was certainly unflattering, he has not shown that the risk of unfair prejudice outweighed the probative value of the video recording. There was no abuse of discretion.

IV

Berhe next contends that the prosecutor committed flagrant misconduct throughout the trial, depriving him of a fair trial. This is so, he asserts, because the prosecutor improperly shifted the burden of proof, vouched for the credibility of the State's witnesses, expressed his personal opinion of Berhe's guilt, misstated the law, impugned the role and integrity of defense counsel, invited the jury to decide the case on emotional grounds, and made statements that invaded the province of the jury. None of these claims warrant appellate relief.

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Miles, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). A defendant must object to a prosecutor's improper argument at trial. "'[C]ounsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for new trial or on appeal.'" State v. Reed, 168 Wn. App. 553, 577-78, 278 P.3d 203 (2012) (alteration in original) (internal quotation marks omitted) (quoting State v. Russell, 125 Wn.2d 24, 93, 882 P.2d 747 (1994)). If a defendant does not object to the alleged misconduct at trial, the defendant is deemed to have waived any claim of error unless it is shown that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" State v. Emery, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

A

Berhe first contends that the prosecutor, in rebuttal argument, impermissibly shifted the burden of proof by presenting the jurors with a "false choice" as to that which was required to acquit Berhe.

It is misconduct for a prosecutor to shift the burden of proof to the defendant. Miles, 139 Wn. App. at 890. A prosecutor engages in misconduct by arguing that the jury must conclude that the State's witnesses are either lying or mistaken in order to return a verdict of not guilty. State v. Fleming, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996). Similarly, "[t]he tactic of misrepresenting defense counsel's argument in rebuttal, effectively creating a straw man easily destroyed in the minds of the jury, does not comport with the prosecutor's duty to 'seek convictions based only on probative evidence and sound reason.'" State v. Thierry, 190 Wn. App. 680, 694, 360 P.3d 940 (2015) (quoting State v. Casteneda-Perez, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)), review denied, 185 Wn.2d 1015 (2016).

However, a prosecutor has "wide latitude to argue reasonable inferences from the evidence." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). "[T]he prosecuting attorney is entitled to make a fair response to the arguments of defense counsel." State v. Brown, 132 Wn.2d 529, 566, 940 P.2d 546 (1997). In this regard, "[i]t is not misconduct for a prosecutor to argue that the evidence does not support the defense theory." State v. Graham, 59 Wn. App. 418, 429, 798 P.2d 314 (1990).

Here, counsel for Berhe argued during closing argument that Berhe was innocent, that the State ignored witnesses who contradicted its theory of the case, and that those witnesses who did testify on behalf of the State were lying.

> Over the last month, few weeks, month, you have heard from approximately 40 witnesses. They fall into two general categories: Eyewitness who didn't see what happened but are trying very hard to help. . . . The second category is witnesses from Everett's party circle who did see what happened, and they are trying very hard to obscure the truth.
> And there is actually a third group of witnesses in this case. These are the witnesses that the State ignored. . . . The State has ignored witnesses that contradict their story line just like the detectives did.

Berhe's attorney also argued that the State's witnesses were lying to protect the real killer.

> Claire is lying about what she saw to protect someone, and it's not Tomas. She had just met Tomas that day. Lucci, Elijah, and Mike are also lying. They are simply not consistent with themselves or each other. And the question then becomes not if they are lying but why? It is to protect someone, and it's not Tomas. They each point finger at Tomas in inconsistent ways, in ways that are uncorroborated by any forensic evidence or any eyewitness evidence.

In response to defense counsel's argument, the prosecutor's rebuttal argument included the following:

> The defense argument here can be really boiled down to this: It requires you to buy off on three principles.
> One is that there is a deep conspiracy to hide the true identity of the true killer.
> Two, there is a deep conspiracy to frame Berhe, the innocent patsy.
> And three, that Berhe is the unluckiest man in the world.
> You have to—their argument is that you have to buy off on all three of those theories because if one of them collapses, the whole defense argument collapses.
> Conspiracy Theory Number 1, that there is a deep conspiracy where Stukenberg, Cascioppo, and Washington are

- 14 -

covering up for the real killer. That's certainly a theory. It's not supported by any evidence.

Berhe then interposed an objection, asserting that the prosecutor's rebuttal argument constituted burden shifting. The trial court overruled the objection.

The prosecutor continued:

> There is no doubt that the burden of proving those elements that I showed you on the screen are mine. I'm not shifting that burden on them. All I'm saying is they come up here, and they have made an impassioned argument for an hour and 15 minutes, right?
>
> So what supports those arguments that they are making? They don't get to come up here and say a bunch of things and have you just accept them. Scrutinize it.
>
> Where is the evidence of this conspiracy theory?
>
> . . . .
>
> There is no evidence to support Conspiracy Theory Number 1, which is a conspiracy to hide evidence.
>
> The second prong that they absolutely have to have you believing is that—it's more far-fetched than Number 1—is that this deep conspiracy requires Stukenberg, Cascioppo, and Washington to not only cover up for the real killer, but they are willing to finger an innocent patsy.
>
> Where is the evidence of that?
>
> There is none.
>
> . . . .
>
> The conspiracy theory also requires you to believe that he is the unluckiest man in the world. Why I say that is because it requires you to ignore all the other evidence we talked about, the concrete, tangible, evidence.
>
> . . . .
>
> I don't want to sound flip, but this is the type of conspiracy that the wackiest conspiracy website would not even give any time to.
>
> I'll skate through this in the interests of time.
>
> They ask you to view evidence very differently than we do. It's up to you how you view the evidence.
>
> Again, I suggest that you view the evidence first by taking a look at what's concrete and what's tangible and working from there. They are asking you to kind of throw it all up on the wall and just take little bits and pieces from what people say and, since it's a big mess, throw your hands up in the air, and find him not guilty.

Contrary to Berhe's assertions, the prosecutor's rebuttal argument was not an improper characterization of the defense's theory. Berhe's counsel argued that Berhe was innocent and that the State and its witnesses were lying to protect the identity of the true killer. The prosecutor's rebuttal argument was a direct response to that argument. At no point did the prosecutor argue to the jury that it must believe the defense's theory or that it must disbelieve the State's witnesses before it could acquit. Rather, the prosecutor (1) summarized the argument made by defense counsel, (2) argued that there was no evidence to support the defense's theory, and (3) urged the jury to consider all of the evidence. Responding to defense counsel's argument and arguing that no evidence supports it is not misconduct. Brown, 132 Wn.2d at 566; Graham, 59 Wn. App. at 429.

B

Berhe next contends that the prosecutor improperly vouched for the credibility of the State's witnesses and injected his personal opinion into the case. This is so, he asserts, because the prosecutor repeatedly used "we know" statements during closing argument.

It is improper for a prosecutor to personally vouch for the credibility of a witness. State v. Brett, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). "'Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony.'" State v. Robinson, 189 Wn. App. 877, 892-93, 359 P.3d 874 (2015) (internal quotation marks omitted) (quoting

State v. Coleman, 155 Wn. App. 951, 957, 231 P.3d 212 (2010)). "Prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." State v. Allen, 161 Wn. App. 727, 746, 255 P.3d 784 (2011) (internal quotation marks omitted) (quoting State v. Brett, 126 Wn.2d 136, 175, 892 P.2d 29 (1995)), aff'd, 176 Wn.2d 611, 294 P.3d 679 (2013).

Here, Berhe asserts that the prosecutor used "we know" statements 18 times during closing argument. For example, the prosecutor stated during closing argument:

> But now let's look at James Brighton's testimony. Not in isolation, but in relation to all the other evidence that we already know is the tangible, concrete stuff. And when we can compare it to that stuff and we compare it to that evidence and we view it in conjunction with that evidence, we are convinced that Berhe is the shooter, right? It's proven beyond a reasonable doubt.

Berhe objected to the prosecutor's use of "we" at trial and contends on appeal that such statements constitute vouching.

As a preliminary matter, Berhe provides only a single out-of-state authority for the proposition that it is always misconduct for a prosecutor to use "we know" statements during closing argument. We have previously rejected such a contention. See Robinson, 189 Wn. App. at 894 (noting that "we know" statements are not always misconduct).

But that does not mean that "we" statements are always appropriate. To the contrary, courts routinely chastise prosecutors for the use of such statements. See United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005) (a prosecutor's use of "we know" "readily blurs the line between improper vouching and legitimate summary"); United States v. Bentley, 561 F.3d 803, 812

(8th Cir. 2009) (it is improper to use "we know" "when it suggests that the government has special knowledge of evidence not presented to the jury, carries an implied guarantee of truthfulness, or expresses a personal opinion about credibility"); State v. Mayhorn, 720 N.W.2d 776, 790 (Minn. 2006) ("[A] prosecutor is not a member of the jury, so to use 'we' and 'us' is inappropriate and may be an effort to appeal to the jury's passions.").

However, a prosecutor's use of "we" or "we know" in argument is unlikely to warrant reversal. Although Berhe complains that the prosecutor used "we" statements repeatedly, he does not identify a single instance in which the prosecutor's use of such a statement placed the prestige of the government behind a witness or indicated that information not presented to the jury supported the State's case. See Robinson, 189 Wn. App. at 892-93. Here, as in Robinson, the prosecutor's use of "we know" did not imply special knowledge, express a personal opinion, or attempt to appeal to the jury's passions. 189 Wn. App. at 893-94.

Prosecutors should refrain from using "we" and "we know" statements during closing argument. The jury and the prosecutor are not aligned against the defendant. Nevertheless, the prosecutor's statements at issue here did not constitute vouching and, thus, did not constitute misconduct.

C

Berhe next contends that the prosecutor engaged in misconduct by misstating the law and by impugning the role and integrity of defense counsel during rebuttal argument.

- 18 -

A prosecutor commits misconduct by misstating the law in closing argument. State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). It is also misconduct for the prosecutor to disparagingly comment on defense counsel's role or impugn the integrity of defense counsel. Thorgerson, 172 Wn.2d at 451.

Here, during closing argument, Berhe's attorney argued that the State had strategically declined to call certain witnesses to testify. Berhe's counsel suggested that these witnesses contradicted the State's time line.

> And there is actually a third group of witnesses in this case. These are the witnesses that the State ignored. The State's case, his opening statement, his closing statement, the State's case has been misleading. The State has ignored witnesses that contradict their story line just like the detectives did.
> . . . .
> Also, the State has mentioned only these two eyewitnesses, choosing to leave out all the contradictory 911 callers and neighbors.
> . . . .
> Despite the fact that there were nine people in the Eastlake parking lot that night, nine people who likely saw who the real shooter was, the State called Lucci, Claire, Mike, and Elijah. We did not hear from Dominic. Where was Dominic? We did not hear from Kevin Simmonson. Where was Kevin? We did not hear from Jonah Evett. Where was Jonah Evett? The State failed to call witnesses who would contradict their story line, just like the detectives failed to follow leads that pointed to a suspect other than Tomas.

Counsel for Berhe also noted during closing argument that the State failed to present evidence to corroborate a witness's testimony.

> Despite the fact that Detective Cruise told us he spoke to all other 13 homicide detectives at Seattle Police Department about recent homicides, he was unable to corroborate Elijah's story. There is no corroboration that Tomas even has family in Seattle, in Washington nor any corroboration that Elijah and Tomas even went to Greenlake that day.
> If the State could corroborate his story with cellphone tower data that they said—Detective Cruise said they received, he would

have heard it. You would have heard that evidence. You didn't hear it because they don't have it. Detective Cruise told you himself he was never able to figure out any motive.

In rebuttal argument, the prosecutor responded to both arguments made by defense counsel.

They talk about missing witnesses, and the way they phrased it, the way counsel phrased it, was the State didn't call Dominic, they didn't call Kevin, they didn't call Jonah because they would contradict their story line.

Well, where does that come from? Is there evidence that Dominic, Kevin, and Jonah would contradict the State's story line? That's the inference they want you to draw, but there is no instruction at all that the Judge gave you that says if the State doesn't call a witness, you should draw a negative inference from that; you should assume that that person is going to contradict the State's story line. There is absolutely no authority for that. That's their theory. They want you to buy off on it, but it's not supported by the law.

. . . .

They talk about the cell tower evidence. What they ask you to assume—again, it's not in the law—but they have asked you to assume that since the State didn't present any of this evidence, it's bad for the State. There's no law that says that.

On appeal, Berhe contends that the prosecutor's rebuttal argument misstated the law and impugned the role and integrity of defense counsel. This is so, he asserts, because the prosecutor suggested that defense counsel did not have a right to argue that the State's failure to properly investigate and present evidence could be used to find reasonable doubt. Moreover, Berhe avers, the prosecutor's rebuttal argument maligned defense counsel by suggesting that defense counsel was deceiving the jurors.

As a preliminary matter, Berhe did not object to the prosecutor's rebuttal argument on these grounds at trial. Accordingly, he must demonstrate not only that the prosecutor's statements were both improper and prejudicial in the

context of the entire argument, but that the statements were "so flagrant and ill intentioned that no curative instruction would have been capable of neutralizing the resulting prejudice." Reed, 168 Wn. App. at 578.

Berhe's contentions are unpersuasive. Just as defense counsel was entitled to argue that the State had fallen short of meeting its burden, the prosecutor was entitled to make a "fair response to the arguments of defense counsel." Brown, 132 Wn.2d at 566. Additionally, nothing in the prosecutor's rebuttal argument served to impugn the role or integrity of defense counsel. Prosecutors are afforded significant latitude in closing arguments—it is not improper to disparage opposing counsel's arguments. Warren, 165 Wn.2d at 30. Moreover, even assuming that the prosecutor's rebuttal argument did misstate the law, Berhe has made no attempt to show that such a misstatement could not have been neutralized through a proper curative instruction. No appellate relief is warranted.

D

Berhe next contends that the prosecutor, in closing argument, improperly encouraged the jury to reach a verdict based on what "feels right."

It is misconduct for a prosecutor to appeal to the jury's passion and prejudice and encourage the jury to base its verdict on emotion, rather than on properly admitted evidence. Glasmann, 175 Wn.2d at 710.

Here, prior to discussing the elements of the charged crimes, the prosecutor made the following argument:

> The law is not a mystic thing, right? It's supposed to
> represent us as a society. That's what the law is. Our shared

- 21 -

beliefs, our shared understanding, our shared morals. The law is simply a codification of it. We put it in writing, we have some numbers attached to it, and we put it all in a book. And that's what you have before you in the form of these jury instructions: The law.

At first blush, you might look at this and think, God, that's really complicated, it's really wordy, it's killed a lot of trees. It might be confusing. But I suggest to you it's not. Take a look at it. If you are confused by it, read it again because if you read it carefully and you think about it, you will see that it makes sense. That's because the law is rooted in our common intellectual sense. The law is also rooted in our common moral sense. Rooted in our common intellectual sense and rooted in our common moral sense.

What that means is if we apply the law to the facts that are proven at trial, if we follow the law, we are going to reach the correct verdict. And when we do that, because it's our shared common intellectual sense and our common moral sense, when we follow the law, it will feel right. And it will feel right—

Berhe interposed an objection, asserting that the prosecutor's argument constituted improper vouching. The trial court overruled the objection and the prosecutor continued:

It will feel right here, intellectually. It will feel right here, morally. It will feel right here. That's because it makes sense. The law makes sense. It makes sense here.

Contrary to Berhe's assertions, the prosecutor's argument did not encourage the jury to render a verdict based on what "feels right." Rather, the context of the closing argument makes clear that the prosecutor was describing how *following and applying the law* "feels right." Such an argument is not misconduct. Indeed, "courts frequently state that a criminal trial's purpose is a search for truth and justice." State v. Curtiss, 161 Wn. App. 673, 701, 250 P.3d 496 (2011).

In any event, the trial court instructed the jury to reach a decision "based on the facts proved to you and on the law given to you, not on sympathy,

- 22 -

prejudice, or personal preference." The jury is presumed to have followed the court's instruction. Curtiss, 161 Wn. App. at 702. Berhe fails to establish error.

E

Berhe next contends that the prosecutor improperly misrepresented facts not in evidence during his examination of Detective Alan Cruise.

Prior to trial, counsel for Berhe sought to admit evidence of a firearm found on the body of the victim. Defense counsel explained that "there is evidence in this case that the firearm that was found on Mr. Williams' person was a firearm that he stole from Dominic Oliveri." Counsel continued, "It's the defense theory, obviously, that Mr. Oliveri had motive to kill Mr. Williams and sought to do so on the day of the incident." Counsel noted, however, that Berhe had no intention of calling Oliveri to testify because "[o]bviously, Mr. Oliveri will invoke his Fifth Amendment privilege. He likely won't be with us to discuss his take on it."

Neither counsel for Berhe nor the State had been able to directly contact Oliveri. Both parties had spoken to Oliveri's counsel, Tim Leary, who denied requests to speak with Oliveri and stated that Oliveri would exercise his right to remain silent if called to testify. Both parties recognized that Oliveri could not make a "blanket invocation" of his right to remain silent when he did not know what questions would be asked of him. Nevertheless, both parties notified the trial court that they would not seek to call Oliveri as a witness.

At trial, Berhe's attorney sought to implicate Oliveri by eliciting testimony from several witnesses. Several witnesses testified that Oliveri had disappeared

- 23 -

following the murder. In response to that testimony, the State elicited the following testimony from Detective Cruise, who was involved in investigating the case:

Q. Let me ask you about Dominic Oliveri.
A. Okay.
Q. You told us that you did interview him pretty early on in this investigation.
A. Yes.
Q. Have you had throughout this investigation reliable contact information for Mr. Oliveri?
A. I have.
Q. Do you continue to have reliable contact information for Mr. Oliveri?
A. I do.
Q. Do you know if that information was shared with the defense?
A. Yes, it was.

Berhe did not object to the prosecutor's line of questioning. Rather, following a brief recess, Berhe's attorney argued to the trial court that the prosecutor's questions created the insinuation that defense counsel spoke with Oliveri, did not like what he had to say, and decided to not call him to testify. The trial court agreed that the jury would wonder why Oliveri was not called to testify if both parties were in contact with him. Accordingly, the trial court permitted Berhe's counsel to elicit testimony clarifying that the parties had successfully contacted Leary, but not Oliveri himself. Furthermore, the trial court ruled that neither party could elicit testimony that Oliveri had invoked his Fifth Amendment rights.

On appeal, Berhe contends that the prosecutor's line of questioning improperly injected information implying that Oliveri was an available witness and

faulting the defense for failing to call him. Berhe also complains that the jury was never told that Oliveri was asserting his Fifth Amendment right to remain silent.

Berhe's contentions are unavailing. As discussed herein, Berhe did not object to the prosecutor's line of questioning. Rather, Berhe sought to elicit testimony clarifying that the defense had contact information for Oliveri's attorney, rather than contact information for Oliveri himself. The trial court granted Berhe's request. Detective Cruise later testified that he had contact information for only Oliveri's attorney and that Oliveri himself was unwilling to speak with Cruise. As for Berhe's contention that he was somehow prejudiced by the fact that the jury was not told that Oliveri was invoking his Fifth Amendment rights, counsel for Berhe explicitly told the trial court that he was *not* seeking to elicit such testimony. There was no error.

F

Berhe also contends that the prosecutor improperly invaded the province of the jury by eliciting opinion testimony about a surveillance video.

Detective Jon Engstrom testified on behalf of the State. Engstrom's role in this case was to provide technical investigation support. Specifically, Engstrom recovered surveillance video from a convenience store in Eastlake. Engstrom testified that, after collecting the surveillance video, he checked the date and time on the video and compared it to his cellular phone.

The State called Detective Cruise and the surveillance video was played for the jury. As the video was playing, the prosecutor asked Cruise various questions about the individuals who appeared in the video. Berhe objected to

the testimony. "Your Honor, Detective Cruise does not have any independent knowledge of what was going on on that day. He is just looking at the same thing the jurors are looking at. He does not have any expertise in reviewing this video. I would just ask that the jurors be allowed to see the video." The trial court ruled that the State could ask Cruise what he saw on the video.

On appeal, Berhe contends that the prosecutor improperly invaded the province of the jury by asking Cruise to identify the various people who appeared in the video. But Berhe fails to elaborate further as to how the complained of conduct constitutes prosecutorial misconduct. Berhe's contention is better framed as an assignment of error to the trial court's evidentiary ruling permitting Cruise to give lay opinion testimony concerning the identity of the individuals in the video.

We review a trial court's ruling admitting evidence for an abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). "A lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." State v. Hardy, 76 Wn. App. 188, 190, 884 P.2d 8 (1994), aff'd, 129 Wn.2d 211, 916 P.2d 384 (1996).

Berhe makes no argument that he was prejudiced in any way by Cruise's testimony concerning what he saw on the surveillance video. Indeed, he does

not even dispute that the individuals who appeared on the video were the same individuals identified by Cruise. Berhe's contentions that Cruise's testimony invaded the province of the jury and that the prosecutor committed misconduct by eliciting such testimony are nothing more than conclusory arguments, lacking support.

There was no error.

V

Berhe next contends that he was deprived of a fair trial because, he avers, racial animus existed among the jurors. Berhe asserts that the trial court erred both by not holding a full evidentiary hearing on the allegation and by denying his motion for a new trial. We disagree.

"Under Washington law, the right to a jury trial includes the right to an unbiased and unprejudiced jury." State v. Jackson, 75 Wn. App. 537, 543, 879 P.2d 307 (1994). Minimal standards of due process are violated by the failure to provide a defendant with a fair hearing. Jackson, 75 Wn. App. at 543.

Trial courts have "significant discretion to determine what investigation is necessary on a claim of juror misconduct." Turner v. Stime, 153 Wn. App. 581, 587, 222 P.3d 1243 (2009). "A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury." State v. Balisok, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994). "In general, it is preferable to resolve the question of juror bias during voir dire rather than through a postverdict motion for a new trial. When, however, this type of issue is

raised postverdict and the moving party has made a prima facie showing of bias, an evidentiary hearing is always the preferred course of action." Jackson, 75 Wn. App. at 543-44.

We review a trial court's decision to deny a motion for a new trial for an abuse of discretion. Dean v. Grp. Health Coop. of Puget Sound, 62 Wn. App. 829, 834, 816 P.2d 757 (1991). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. Littlefield, 133 Wn.2d at 46-47.

Here, following entry of the verdicts, one of the jurors (the holdout juror) voluntarily contacted defense counsel and stated that she believed that juror misconduct had occurred. Berhe sought a time extension to file a motion for a new trial and the State requested a hearing to discuss the motion. In the interim, the trial court was contacted by at least one other juror who complained of unsolicited contact from defense counsel. Following a hearing, the trial court ordered the parties to refrain from initiating further contact with the jurors. The trial court sent a letter to the jurors, informing them that counsel would like to speak with them and providing them with counsel's contact information.

Defense counsel worked with the holdout juror to craft a declaration that set forth the holdout juror's concerns. The declaration stated that the holdout juror did not believe that Berhe was guilty, that she felt personally attacked and belittled during the deliberation process, and that she felt that these attacks were the result of implicit racial bias.

The holdout juror stated in her declaration that she was accused of being "partial" toward Berhe because she was the only African American juror. The holdout juror stated that some jurors reacted negatively and verbally aggressively toward her after she raised concerns about police misconduct toward African Americans. The holdout juror stated that the treatment that she received from the other jurors made her feel "emotionally abused; so much so that it became debilitating," and that she "couldn't handle the pressure of being a hold-out anymore."

The holdout juror's declaration set forth no allegations of racially charged remarks or race-based derision made by the other jurors. Neither did the declaration allege that the jurors were biased against Berhe because of his race. Rather, the declaration consisted of the holdout juror's subjective impressions regarding the other juror's conduct and the conclusory statement that such conduct must have been the result of implicit racial bias.

Six other jurors voluntarily contacted the prosecutor and provided declarations concerning the deliberation process. Each juror was asked two questions: (1) "Did you personally do anything to [the holdout juror] which was motivated by racial bias during deliberations?" and (2) "Did you observe any other juror do anything to [the holdout juror] which appeared to be motivated by racial bias during deliberations?" Each of the jurors answered both questions in the negative. Several of the jurors expressed frustration with the holdout juror because, although she resisted the notion that Berhe was guilty, she "could not support her position with any of the evidence," "bas[ed] her position on sentiment

- 29 -

rather than facts & reasoning," and "had not been open[] minded during the entire process."

The trial court considered the declarations submitted by each party. The trial court observed that the holdout juror was the only African American on the jury and that she was the last juror to vote to convict. The trial court further noted:

> In her declaration, [the holdout juror] stated that she felt personally attacked by her fellow jurors.
>
> . . . The jury was polled at the time of the verdicts. Each juror was asked if the verdicts were the verdicts of the jury as a whole and that juror's verdicts individually. Each juror, including [the holdout juror], verbally stated that the verdicts returned were the verdicts of the jury as a whole and that juror's verdicts individually.
>
> . . . The only evidence to support [the holdout juror's] subjective feeling that she was attacked by her fellow jurors because of her race comes from [the holdout juror's] declaration.
>
> . . . The only evidence that race may have inappropriately been discussed by the jurors during deliberations comes from [the holdout juror's] declaration.
>
> . . . The only evidence that members of the jury were implicitly or explicitly racially bias[ed] or inappropriately considered race comes from [the holdout juror's] declaration.

The trial court arrived at the following conclusions:

> It is not inappropriate for jurors to press other jurors on their respective positions during deliberations.
>
> . . . The remaining hold-out juror is frequently subject to pressure by fellow jurors and such pressure is not inappropriate.
>
> . . . The court finds that there is insufficient evidence to conclude that juror misconduct occurred with respect to racism – implicit or explicit.

. . . Mr. Berhe failed to make a prima facie showing of juror misconduct warranting an evidentiary hearing. State v. Jackson, 75 [Wn. App. 537, 879 P.2d 307] (1994).

On appeal, Berhe asserts that the holdout juror's declaration necessarily constitutes a prima facie showing of racial bias and that the trial court erred by failing to hold an evidentiary hearing in light of that declaration. Berhe relies on our opinion in Jackson, 75 Wn. App. 537, in support of this proposition.

Jackson involved an African American defendant who moved for a new trial based on allegations of racial bias and misconduct by one of the jurors (juror X). Jackson obtained a declaration from a juror who overheard juror X making racially charged statements during deliberations. For example, juror X was overheard complaining about having to interact with people of color during a family reunion: "The worst part of the reunion was that I had to socialize with the coloreds," "[y]ou know how those coloreds are." Jackson, 75 Wn. App. at 540 (internal quotation marks omitted).

The trial court in Jackson considered the declaration and denied the motion for a new trial, finding that juror X's statements did not indicate racial bias. 75 Wn. App. at 542. We reversed, holding that the trial court erred by denying Jackson's motion for a new trial without first conducting an evidentiary hearing.

> The trial court, however, decided not to conduct an evidentiary hearing and, based only on the affidavit, denied Jackson's motion for a new trial. In a case where the defendant was African-American, the defendant's alibi witnesses were African-American, and the ultimate outcome turned on credibility, this was error. An evidentiary hearing was the only appropriate course of action given Jackson's prima facie showing of racial bias. Accordingly, we hold that as a matter of due process, the trial court erred when it ruled on Jackson's motion for a new trial without having conducted an evidentiary hearing.

Jackson, 75 Wn. App. at 544 (footnote omitted). In so holding, we noted that Juror X's statements "create[d] a clear inference of racial bias" and that such statements "demonstrated that juror X held certain discriminatory views which could affect his ability to decide Jackson's case fairly and impartially." Jackson, 75 Wn. App. at 543.

Here, unlike in Jackson, the holdout juror's declaration contained no details buttressing the allegation of racial bias. The declaration set forth the holdout juror's subjective perceptions concerning the conduct of the other jurors and the holdout juror's belief as to the reasons for that conduct. The trial court credited the holdout juror's perceptions. But, the court concluded, those perceptions did not indicate racial bias among the jurors. Rather, the trial judge reasoned, they reflected pressures commonly experienced by holdout jurors. The holdout juror's assertion of racial bias was, thus, a conclusory allegation lacking particularized factual support.

The trial court approached this issue in a deliberate and careful manner. The trial court considered the holdout juror's declaration and found that the allegations contained therein, taken at face value, were insufficient to establish a prima facie showing of racial bias. In so ruling, the trial judge had "the advantage of observing the demeanor of the jurors during voir dire and throughout the trial." Dean, 62 Wn. App. at 838. The judge's decision to deny Berhe's request for a more expansive evidentiary hearing or a new trial was tenable and consistent with the standards articulated in Jackson, 75 Wn. App. at 544.

The trial court did not abuse its discretion by proceeding as it did. Nor did it err by concluding that neither a fuller hearing nor a new trial was warranted.

VI

Berhe next contends that the sentencing court misunderstood its authority to impose concurrent sentences for each of the firearm enhancements.

Berhe was sentenced to a total term of confinement of 420 months. Berhe's sentence consisted of a 300 month standard range sentence for the murder charge and a 113 month standard range sentence for the assault charge, to be served concurrently. The court imposed two 60 month sentences for the firearm enhancements, to be served consecutively. The court rejected Berhe's request to have the firearm enhancements served concurrently after finding that it did not have the authority to do so.

On appeal, Berhe contends that the court erred by refusing to impose concurrent sentences for the firearm enhancements. This is so, he asserts, because the court misunderstood its authority to impose such a sentence.

Pursuant to RCW 9.94A.533(3)(e), firearm enhancements are "mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements." This statutory language deprives sentencing courts of the discretion to impose an exceptional sentence with regard to firearm enhancements. State v. Brown, 139 Wn.2d 20, 29, 983 P.2d 608 (1999).

Nevertheless, Berhe asserts that Brown is no longer good law and that State v. Houston-Sconiers, 188 Wn.2d 1, 391 P.3d 409 (2017), provides such

discretion to sentencing courts. He is wrong. <u>Houston-Sconiers</u> holds that "sentencing courts must have complete discretion to consider mitigating circumstances *associated with the youth of any juvenile defendant*." 188 Wn.2d at 21 (emphasis added). Accordingly, <u>Houston-Sconiers</u> overruled the holding in <u>Brown</u> "with regard to juveniles." <u>Houston-Sconiers</u>, 188 Wn.2d at 21.

Berhe is not a juvenile. Accordingly, his sentence was unaffected by the <u>Houston-Sconiers</u> decision.

## VII

Finally, Berhe contends that cumulative errors mandate the reversal of his conviction. Other than the single, harmless error of admitting certain custodial statements, Berhe has not demonstrated any trial court error. There is nothing to accumulate. Accordingly, this contention does not warrant appellate relief.

Affirmed.

We concur: