# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54359-1-II |
| Respondent, | |
| v. | |
| ZACHARY DEAN CURTIS, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—APV reported that after a small party at her best friend's house, her best friend's boyfriend, Zachary Dean Curtis, sexually assaulted her. Curtis appeals his convictions for third degree rape, indecent liberties with forcible compulsion, and attempted indecent liberties.[1] He argues there was insufficient evidence to support the three convictions, the trial court erred by allowing the State to amend the information after resting its case, the to convict instruction for attempted indecent liberties was inadequate, the prosecutor committed flagrant and ill-intentioned misconduct, trial counsel was deficient for failing to object during closing argument, the trial court conducted an insufficient investigation into alleged juror misconduct, and the trial court abused its discretion when it denied Curtis's request to expend public funds for a special sex offender sentencing alternative (SSOSA) evaluation.

Because the to convict instruction for attempted indecent liberties did not distinguish a particular means of committing indecent liberties, Curtis's conviction for attempted indecent

---

[1] Curtis was also convicted of bail jumping, but he does not challenge that conviction on appeal.

liberties should merge with his conviction for completed indecent liberties with forcible compulsion, as the State concedes. We remand for the trial court to vacate the attempted indecent liberties conviction. On remand, the trial court should expressly determine Curtis's eligibility for a SSOSA on the record, as well as whether it is ordering a SSOSA evaluation, and it should provide an explanation of its reasoning. Because Curtis's conviction for attempted indecent liberties was deemed to be the same criminal conduct as Curtis's remaining counts, resentencing may not be required; but, the trial court should resentence Curtis if doing so becomes necessary in light of the SSOSA analysis on remand.

The remainder of Curtis's arguments are without merit. We affirm Curtis's convictions for third degree rape and indecent liberties with forcible compulsion.

FACTS

On March 3, 2018, APV went to her best friend Miranda Lynch's house. Lynch lived with her boyfriend, Curtis, and their infant son, FC. Prior to this incident, APV went over to Lynch and Curtis's house "all the time." Verbatim Report of Proceedings (VRP) (Jan. 13, 2020) at 212.

APV, Lynch, Curtis, and some of Curtis's friends spent the evening drinking heavily. APV and Curtis also consumed marijuana. APV fell asleep in Lynch's bed with Lynch and FC. She woke up to Curtis grabbing her breast, attempting to turn her over, and removing her clothes. She said that she was in and out of sleep and awoke to Curtis touching her multiple times. She reported that Curtis touched her breasts and vagina and raped her.

The State initially charged Curtis with one count of third degree rape. It amended the information to charge attempted second degree rape (count 1), third degree rape (count 2), indecent liberties with forcible compulsion (count 3), and attempted indecent liberties with a person who is

2

mentally incapacitated and/or physically helpless (count 4). For the attempted indecent liberties count, the amended information alleged that Curtis "with intent to commit Indecent Liberties without force, did knowingly cause A.P.V. . . . to have sexual contact with the defendant or another when A.P.V. . . . was incapable of consent by reason of being mentally defective, mentally incapacitated, or physically helpless" and/or Curtis did an "act which was a substantial step toward the commission of that crime." Suppl. Clerk's Papers at 298-99 (emphasis and boldface omitted).

The State later added a charge of bail jumping in a second amended information. The second amended information inadvertently omitted some of the charging information for the attempted indecent liberties count, which was entitled "Count IV: ATTEMPTED INDECENT LIBERTIES (MENTALLY INCAPACITATED/PHYSICALLY HELPLESS)." Clerk's Papers (CP) at 103 (boldface omitted). The second amended information alleged that Curtis "with intent to commit Indecent Liberties without contrary to Revised Code of Washington 9A.44.100(1)(b), and/or did do any act which was a substantial step toward the commission of that crime." CP at 103-04. It appears that language was omitted between "without" and "contrary to Revised Code of Washington." *Id.* The parties proceeded to trial on this information.

I. TRIAL

A.     The State's Case in Chief

APV testified that prior to March 3, 2018, she had "been in the same room" as Curtis's friends, but she had never "been social" with them or gotten to know them. VRP (Jan. 13, 2020) at 214. On the night of the assault, she "didn't talk to them very much" and did not "have any issues" with them. *Id.*

3

APV testified that, on a scale of 1 to 10, her intoxication level was a 6, and she was not "blacked out." *Id.* at 220. APV described Lynch as "very drunk" and said that after Lynch got sick and went to bed, she took care of FC. *Id.* at 222. Eventually APV went to sleep in Lynch's queen-sized bed with her and FC. Lynch was on one side of the bed, FC was in the middle, and APV was on the other side, up against a wall.

APV testified, "I woke up to someone touching me." *Id.* at 226. She was sleeping on her side, facing the wall, and she remembered "someone trying to turn [her] over." *Id.* at 227. This person grabbed her breast, hard enough to change her position and leave bruises. She explained, "I turned myself back over and it stopped. So, I fell back asleep." *Id.* at 228. At the time, APV did not know who the person was. She believed the person was reaching across Lynch and FC to touch her.

APV continued, "I remember waking back up . . . on my back and he was taking my pants off." *Id.* at 229. Her pants were "above [her] knees," her sweatshirt was "up," and she felt like the person had "squeezed in between" her and FC on the bed. *Id.* at 231. She recalled that she woke up two or three times with her clothes partially off and would "try to turn away." *Id.* "Multiple times[] I would turn over and I'd wake up back on my back." *Id.* at 233. "The whole time I was trying to turn away." *Id.* at 255.

She testified that the person touched her breasts and inside her vagina. Then he got "right on top" of her and penetrated her vagina with his penis. He spit on her and called her something "like a dirty pig or a dirty whore." *Id.* at 236.

APV explained that although her eyes were open, it was dark and she could not see the person who was assaulting her. When asked if she knew who the person was, she said that she had

"a rough idea" based on the person's hands and breathing, but she did not know for sure until he spoke. *Id.* at 235. She testified, "I had a bad feeling. I just knew who it was. I didn't know how to come to terms with it." *Id.* "I trusted him. So, it was just so out of the blue." *Id.* at 236. When he spoke, APV said she knew it "had to be someone bigger" and that "it was clearly not anyone else who was around." *Id.* at 237. APV had known Curtis for two or three years when the assault occurred.

On cross-examination, APV agreed that "the whole time [she] didn't know exactly who was doing the touching." *Id.* at 259. On redirect, when asked whether she felt threatened during the assault, she said, "During it, absolutely. I've never felt threatened before though, I trusted Zach[ary Curtis] the whole time I've known him." *Id.* at 273.

A day or two later, APV reported to the police that Curtis had sexually assaulted her. Former Detective Sergeant Monty Buettner investigated the case. Buettner testified that APV's "main concern, secondary to what actually, physically occurred, was who it involved. It involved somebody that she trusted and she was concerned that, you know, her best friend is in a relationship with this person [and has an] in common child." *Id.* at 282. "[S]he was very worried about what that meant. . . . She was very concerned for her friend." *Id.*

The jury watched a video of Buettner's interview with Curtis. In the interview, Curtis admitted he was very drunk on the night of the assault and insisted that he could not remember anything that happened after he went into the house and went to bed. He remembered waking up the next morning in bed with Lynch and FC. When asked how intoxicated he was on a scale of 1 to 10, Curtis reported that he was "pretty much 9 1/2, 10 because [he] was drinking [vodka] out of the bottle." *Id.* at 289. He believed APV was intoxicated too.

Curtis learned about the allegations from Lynch, after APV talked to Lynch. He told Buettner that he "didn't believe it at first," but then he called APV and asked her what happened. *Id.* at 294. After talking to her on the phone, Curtis told Buettner that he has "got to believe her" because he had known APV for almost three years, and "[s]he seems like a super honest person." *Id.* at 295.

When asked whether he thought there should be consequences for his actions, Curtis responded, "I would love to go to alcohol classes and stuff like that. . . . Because in my eyes, I don't even want to drink again, because I don't ever want to run into this situation again." *Id.* at 315. He later added, "I don't think I should get off scot[-]free on anything for what I have done and I would love to make it right." *Id.* at 317. "I mean there ain't no way around it. I mean it happened." *Id.* at 321.

B.    Midtrial Motions and Curtis's Case in Chief

After the State rested, Curtis moved to dismiss the attempted second degree rape charge (count 1), the third degree rape charge (count 2), and the indecent liberties with forcible compulsion charge (count 3). He argued the State failed to prove an expressed lack of consent because the evidence showed "a 45 minute to 60 minute sexual encounter with no stop uttered." *Id.* at 354. Curtis also argued the State failed to present a prima facie case of forcible compulsion.

The trial court disagreed and found that viewing the evidence in the light most favorable to the State, APV turning away on multiple occasions was "an expression of non-consent." *Id.* It further found that the State presented evidence of forcible compulsion because APV testified that when she attempted to turn away, she was "force[d] . . . back onto her back." *Id.* at 351. The trial court denied the motions to dismiss counts 1, 2, and 3.

6

Curtis also moved to dismiss the attempted indecent liberties charge (count 4), arguing the second amended information failed to state a crime. The State acknowledged that language was omitted but described the omitted language as a scrivener's error and moved to amend the information. The trial court granted the State's motion, and the State filed a third amended information. It used the same language for the attempted indecent liberties charge as the first amended information and alleged that Curtis "with intent to commit Indecent Liberties without force, did knowingly cause A.P.V. . . . to have sexual contact with the defendant or another when A.P.V. . . . was incapable of consent by reason of being mentally defective, mentally incapacitated, or physically helpless" and/or Curtis did an "act which was a substantial step toward the commission of that crime." CP at 174-75 (emphasis and boldface omitted).

Curtis then proceeded with the defense case in chief. He called three witnesses—a pharmacological expert who testified about how drugs, including alcohol, affect memory, intent, and executive functioning; a friend of Curtis's who was present on the night of the offense; and Lynch. On cross-examination, the State elicited testimony from both Curtis's friend and Lynch that APV was physically larger than Lynch and had larger breasts.

C.      Jury Instructions

The jury was instructed, "A person commits the crime of attempted Indecent Liberties when, with intent to commit that crime, he or she does any act that is a substantial step toward the commission of that crime." CP at 201. The to convict instruction for attempted indecent liberties listed the essential elements of the crime as: (1) "the defendant did an act that was a substantial step toward the commission of Indecent Liberties," (2) "with the intent to commit Indecent Liberties," (3) "in the State of Washington." CP at 202.

7

A separate instruction defining "indecent liberties" listed multiple means of committing the offense. It provided that a person commits the crime of indecent liberties if they "knowingly cause[] another person to have sexual contact with [them] by forcible compulsion, or when the other person is incapable of consent by reason of being mentally defective or mentally incapacitated, or, when the other person is incapable of consent by reason of being physically helpless." CP at 197.

D.      Closing Argument

The prosecutor began his closing argument by stating that "this case is about betrayal . . . . Betrayal of a young girl who was raped, but also betrayal of an entire family." VRP (Jan. 14, 2020) at 494. "As he raped this young girl, the Defendant did it while his wife[2] and child were right next to her. I said it was a troubling case and unique case and that's exactly what you heard about." *Id.* "I would argue [APV's] life changed forever that day." *Id.*

After reviewing the definition of "consent" as "words or conduct indicating freely giv[en] agreement" to sexual contact, the prosecutor stated, "I would argue her turning over multiple times is indicating to him I don't want to have sexual relations, sexual contact with you." *Id.* at 497. In addressing the charge of indecent liberties with forcible compulsion, he said, "I would argue we have some of the best evidence in this case showing forcible compulsion. Showing that [Curtis] forced [APV] on her back. That he forced her into a position where he could commit this act. We have pictures of bruising on her breasts." *Id.* at 499. He continued, "To get bruising like that, he had to grab her pretty hard. I would argue that's great evidence of forcible compulsion." *Id.* "I would argue that there was more than enough evidence in this case for you to convict." *Id.* at 505.

---

[2] At the time of trial, Lynch was Curtis's fiancé.

After referring to testimony from Buettner that a delay in reporting sexual assaults is common, the prosecutor stated, "I would argue sometimes it takes years for someone to come to terms or be willing to deal with the scrutiny that comes when you report and also with knowing what you could do to that person you're reporting about." *Id.* He described Buettner's interview with Curtis and recalled that Curtis made statements similar to "I feel like a piece of crap. It happened. It is what it is. I shouldn't get off scot[-]free." *Id.* at 508. The prosecutor argued, "I urge you to follow the Defendant's advice. Don't let him get off scot[-]free." *Id.*

To counter testimony from the defense expert suggesting that Curtis could have been so intoxicated he reflexively, or unintentionally, grabbed and assaulted APV, the prosecutor argued, "Quietly reaching over your partner and your child to touch someone else's breasts. I do not believe the Defendant had ever done that before. That's not a reflexive action. Especially when her breast is different than his wife's breast." *Id.* at 511. He continued, "Forcing your fingers and penis inside of this person you've never been intimate with in the past. Spitting on this person. Calling her a dirty whore. . . . All of this is evidence of executive thinking." *Id.* "It shows the Defendant knew exactly what was going on and was lucid when this happened." *Id.*

The prosecutor supported his argument that Curtis's actions were intentional by saying that "there is some evidence the Defendant was attracted to [APV]." *Id.* at 513. The first thing Curtis does is he "[g]rabs her breast and he knows that's not his wife's breast because they have very different figures, very different sizes." *Id.* The prosecutor argued, "This is important and it's gross and it's awkward to think about, but the Defendant had been with Miranda Lynch for three years. I would argue he was attracted to something different." *Id.*

The prosecutor used "I would argue" twice more, once when talking about the credibility of Curtis's friend and once when talking about APV's credibility. *Id.* at 512, 532. In rebuttal, he referred to APV's testimony and said, "What a weird, convoluted scenario to make up and then have to explain later. I would argue that because this is so unique and odd and terrible, that it lends credibility and makes sense." *Id.* at 532.

E.      Verdicts

The jury acquitted Curtis of attempted second degree rape (count 1). It found him guilty of third degree rape (count 2), indecent liberties with forcible compulsion (count 3), and attempted indecent liberties (count 4), as well as bail jumping (count 5).

## II. POSTTRIAL MOTIONS

A.      Motion for New Trial

Curtis timely moved for a new trial pursuant to CrR 7.5(a)(2). He claimed that when leaving the courthouse after the first day of trial, one of the jurors said to him, "[Y]ou're getting blamed for everything else so I may as well blame you for my dog being stuck in the house and not being able to go to the bathroom." CP at 221 (boldface omitted). Curtis's mother declared that she heard the juror say, "'[M]ight as well blame you for all the messes I'm going to clean up because I was here all day.'" CP at 222.

The State argued that even assuming the juror made this statement, it at most demonstrated "a level of understandable frustration with the inconveniences of serving as a juror, not actual bias" sufficient to warrant a new trial. CP at 248. The trial court ruled that Curtis failed to show prejudice and denied the motion for a new trial without holding an evidentiary hearing.

B.      Motion for SSOSA Evaluation

Curtis moved for the trial court to authorize $2,500 in public funds for an evaluation of Curtis's amenability to treatment so that he could be considered for a SSOSA. The motion included an affidavit from Curtis's trial counsel, which stated, "This defendant is court-appointed to my firm and thus the Court has made a previous determination that the defendant is indigent. In addition, the defendant is now in custody which eliminates his present ability to earn money." CP at 233. Curtis also completed a financial declaration, which was filed with the motion. Counsel represented that he believed Curtis was statutorily eligible for a SSOSA and argued an evaluation would be "reasonably necessary to make a fair sentencing determination." *Id.*

The trial court denied the motion. It crossed out the language of Curtis's proposed order and wrote, "Order is Denied." CP at 244. The record does not contain any discussion of the request or the reasoning behind the trial court's decision. The first page of Curtis's presentence investigation report states, "As a Special Sex Offender Sentencing Alternative is not being considered, no psychosexual evaluation or full disclosure polygraph has been ordered." CP at 252. The report does not designate a SSOSA as a sentencing option.

### III. SENTENCING

The trial court ruled that the third degree rape, indecent liberties with forcible compulsion, and attempted indecent liberties convictions were all based on the same criminal conduct, so it determined that Curtis's offender score for each offense was 1. It imposed a midrange sentence of 13 months for the third degree rape conviction and a midrange sentence of 18 months for the attempted indecent liberties conviction. These sentences would run concurrently with Curtis's

most severe sentence of 65 months to life for indecent liberties with forcible compulsion. Due to his conviction for indecent liberties with forcible compulsion, Curtis's maximum term is life.[3]

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

To address a claim of insufficient evidence, "we view the evidence in the light most favorable to the State and determine whether 'any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Frahm*, 193 Wn.2d 590, 595, 444 P.3d 595 (2019) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). We draw all reasonable inferences from the evidence in favor of the State and interpret the inferences "'most strongly against the defendant.'" *State v. Dreewes*, 192 Wn.2d 812, 822, 432 P.3d 795 (2019) (internal quotation marks omitted) (quoting *State v. Johnson*, 188 Wn.2d 742, 762, 399 P.3d 507 (2017)). We defer to the trier of fact to resolve conflicting testimony and evaluate the persuasiveness of the evidence. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

A.      Identity of Curtis as the Perpetrator, Generally

Curtis argues the State presented insufficient evidence to sustain his convictions for third degree rape (count 2), indecent liberties with forcible compulsion (count 3), and attempted indecent liberties (count 4) because APV's testimony referenced "'the person,' 'a person,' or 'the

---

[3] Curtis was acquitted on count 1, attempted second degree rape. At sentencing and in the judgment and sentence, the trial court appears to misnumber the counts, starting with count 1 and ending with count 4, instead of starting with count 2 and ending with count 5. This appears to be a scrivener's error.

individual' in the room." Br. of Appellant at 16. "While she testified that she recognized the voice of the person, she never testified [whose] voice it was." *Id.*[4] We disagree.

Curtis selectively argues about portions of testimony where APV referred to an "individual" or "person" assaulting her. However, the State also presented evidence that APV identified this person as Curtis. APV testified that she recognized the voice of the person who assaulted her. Although she did not expressly state that this was Curtis's voice, it was implied by the fact that she had known Curtis for several years before this incident and regularly spent time with him, whereas she did not talk very much to the other men who were at the house that evening.

Additionally, APV testified that she knew and trusted this person. *See* VRP (Jan. 13, 2020) at 235-36 ("I just knew who it was. I didn't know how to come to terms with it. . . . I trusted him."). Again, she knew Curtis well, whereas she had not gotten to know the other men who were at the house. At one point, she even stated that although she felt threatened during the assault, she had "never felt threatened before," saying, "I trusted Zach[ary Curtis] the whole time I've known him." *Id.* at 273.

Buettner echoed that APV was particularly concerned because the incident "involved somebody that she trusted and she was concerned that, you know, her best friend is in a relationship with this person [and they] have a[n] in common child." *Id.* at 282. The jury was informed that APV and Lynch were best friends and that Lynch had a child with Curtis.

---

[4] In his opening brief introduction, Curtis claims, "[A]ny evidence that the prosecution may argue identifies Mr. Curtis . . . was admitted in violation of the Corpus Delicti rule." Br. of Appellant at 1 (emphasis omitted). However, Curtis does not raise a violation of the corpus delicti rule in his assignments of error or present any additional argument, so we decline to address this claim. RAP 10.3(a)(4), (6).

Finally, Curtis acknowledged that APV identified him as the perpetrator during his interview with Buettner. Curtis said that he learned of the allegations when APV told Lynch what had happened. He also admitted to hearing these allegations directly from APV when he called her.

Viewing all reasonable inferences in favor of the State and interpreting the evidence most strongly against the defendant, a rational finder of fact could have found that APV identified Curtis as the perpetrator and that he was the perpetrator beyond a reasonable doubt. We hold the State presented sufficient evidence to identify Curtis as the perpetrator.

B.      Third Degree Rape (Count 2)

Curtis argues the State failed to prove APV "'clearly expressed'" her lack of consent, an essential element of third degree rape in 2018. Br. of Appellant at 32 (boldface omitted) (quoting former RCW 9A.44.060(1)(a) (2013)). He argues APV's conduct of turning away could give rise to multiple interpretations and, thus, her expression was not clear. We disagree.

In 2018, a person was guilty of third degree rape if the person "engage[d] in sexual intercourse with another person," "the victim did not consent as defined in RCW 9A.44.010(7)," and "such lack of consent was clearly expressed by the victim's words or conduct." Former RCW 9A.44.060(1)(a). "'Consent' means that at the time of the act of sexual intercourse . . . there are actual words or conduct indicating freely given agreement to have sexual intercourse." RCW 9A.44.010(2).[5]

---

[5] The legislature amended RCW 9A.44.060(1)(a) in 2019 and deleted the requirement that the victim's lack of consent be "clearly expressed by the victim's words or conduct." S.B. 5649, 66th Leg., Reg. Sess., § 3 (Wash. 2019). The definition of "consent" remained the same. However, the

Division Three has interpreted former RCW 9A.44.060(1)(a) to require the State to show a "lack of consent was made known to [the defendant] by words or conduct without doubt or question." *State v. Higgins*, 168 Wn. App. 845, 854, 278 P.3d 693 (2012). When considering this element, however, "[o]ur focus, and certainly the jury's focus, is more properly on the victim's words and actions," not the defendant's "subjective assessment of what is being communicated." *Id.* It is the jury's role to determine whether the victim clearly expressed a lack of consent, and the jury may find that the defendant's perception "was divorced from reality or at least not consistent with the evidence." *Id.* at 855. Where a victim clearly expressed their lack of consent by either words or conduct, "any asserted 'misunderstanding' by a perpetrator is unreasonable and justifies punishment." *State v. Duarte Mares*, 190 Wn. App. 343, 353, 361 P.3d 158 (2015).

APV testified that she repeatedly turned away from Curtis in an effort to stop the assault. *See* VRP (Jan. 13, 2020) at 228 ("I turned myself back over and it stopped."), 231 ("I'd try to turn away."), 233 ("Multiple times[] I would turn over and I'd wake up back on my back."), 255 ("The whole time I was trying to turn away."). She also testified that there were three adults and one child in the queen-sized bed, and that she was up against the wall, which limited her ability to move away. Viewing this evidence in the light most favorable to the State, APV's conduct of repeatedly turning away from the sexual contact clearly expressed her lack of consent to it. The jury was permitted to find that any misunderstanding was unreasonable and inconsistent with the evidence. We hold the State presented sufficient evidence to sustain Curtis's conviction for third degree rape.

---

legislature alphabetized the definitions provided by RCW 9A.44.010, moving the definition of "consent" from section (7) to section (2), effective January 1, 2022.

C.      Indecent Liberties with Forcible Compulsion (Count 3)

Curtis argues the State failed to present evidence that he "engaged in force which overcame resistance" or that he made "any threat" to support the charge of indecent liberties with forcible compulsion. Br. of Appellant at 17. He claimed that APV was not "resisting such that force [was] needed to overcome the resistance" when she pretended to be asleep. *Id.* at 18. We disagree.

A person is guilty of indecent liberties when they "knowingly cause[] another person to have sexual contact . . . [b]y forcible compulsion." RCW 9A.44.100(1)(a). "'Forcible compulsion' means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury." RCW 9A.44.010(3).[6] The physical force must be "'directed at overcoming the victim's resistance'" and "'more than that which is normally required to achieve penetration.'" *State v. Corey*, 181 Wn. App. 272, 277, 325 P.3d 250 (2014) (quoting *State v. Wright*, 152 Wn. App. 64, 71, 214 P.3d 968 (2009)). It is distinguishable from "'the force inherent in any act of sexual touching.'" *Id.* (internal quotation marks omitted) (quoting *State v. Ritola*, 63 Wn. App. 252, 254, 817 P.2d 1390 (1991)). In *Corey*, for example, the jury did not find forcible compulsion where the victim "did not describe any force used by [the defendant] beyond that which was required to make physical contact with her." *Id.* at 278; *see also Ritola*, 63 Wn. App. at 255 (reversing conviction for indecent liberties with forcible compulsion where the defendant used only "the force necessary to touch").

Here, the evidence shows Curtis used more force than was necessary to touch APV. APV resisted Curtis's sexual contact by repeatedly turning away from him. To overcome this resistance,

---

[6] In 2020, the definition of "forcible compulsion" was moved from section (6) to section (3) effective January 1, 2022. Because the definition remains the same, we are citing to the current version of the statute.

Curtis repeatedly pulled APV onto her back. This physical force was intended to overcome APV's resistance; it was not force inherent in any act of sexual touching. Significantly, the force was sufficient to leave bruises on APV's breast. We hold the State presented sufficient evidence of forcible compulsion to sustain Curtis's conviction for indecent liberties.

Curtis also claims the trial court erred by denying his motion to dismiss the third degree rape charge and indecent liberties with forcible compulsion charge after the State rested its case due to the State's failure to present sufficient evidence. For the same reasons there was sufficient evidence to support these convictions, the trial court did not err when it denied Curtis's midtrial motions to dismiss.

## II. ATTEMPTED INDECENT LIBERTIES (COUNT 4)

Curtis argues the to convict instruction for attempted indecent liberties (mentally incapacitated/physically helpless) failed to include all of the necessary elements for a jury to find him guilty of that crime. The instruction required a finding of a substantial step toward committing indecent liberties and intent to commit indecent liberties. But the instruction failed to include requirements that the jury find a knowing mental state and that Curtis believed APV was incapable of consent.

The State argues the to convict instruction was sufficient because the only essential elements of attempted indecent liberties are a substantial step toward committing the crime of indecent liberties and intent to commit that crime. However, the State concedes that because indecent liberties is an alternative means crime, "if this Court upholds the verdict on count 3 [indecent liberties with forcible compulsion], Curtis's conviction on count 4 [attempted indecent liberties] should be vacated since [the counts] would merge" Br. of Resp't at 32. We accept the

State's concession and remand for the trial court to vacate Curtis's conviction for attempted indecent liberties.

The double jeopardy clauses of the federal and state constitutions protect against multiple convictions for the same offense. *In re Pers. Restraint of Knight*, 196 Wn.2d 330, 336, 473 P.3d 663 (2020). "For double jeopardy purposes, a lesser included offense is the 'same offense' as the greater offense." *State v. Fuller*, 185 Wn.2d 30, 37-38, 367 P.3d 1057 (2016). Generally, an attempt crime is a lesser included offense of that completed crime. *State v. Gallegos*, 65 Wn. App. 230, 234, 828 P.2d 37 (1992). "When a finding of guilty is made regarding both the greater and the lesser-included offense, the entry of judgment for the lesser offense must be vacated, as it is deemed to have merged in the finding of guilty of the greater offense." *State v. Rhodes*, 18 Wn. App. 191, 193, 567 P.2d 249 (1977).

Here, the to convict instruction for attempted indecent liberties included the two essential elements of the crime—a substantial step toward committing indecent liberties and an intent to commit that crime. But the instructions did not establish which means of indecent liberties was at issue. The trial court provided a separate definition of "indecent liberties" that listed multiple possible means of committing the crime.

The jury instructions defined "indecent liberties" as knowingly causing another person to have sexual contact "by forcible compulsion, *or* when the other person is incapable of consent by reason of being mentally defective or mentally incapacitated, *or*, when the other person is incapable of consent by reason of being physically helpless." CP at 197 (emphasis added). Although the State distinguished the basis of the attempt charge in the information and on the verdict form as APV's perceived inability to consent, rather than forcible compulsion, this

distinction was not carried through to the jury instructions. The jury could have convicted Curtis of attempted indecent liberties because it believed that he attempted indecent liberties by forcible compulsion. Curtis was separately convicted of indecent liberties by forcible compulsion. We therefore accept the State's concession and remand for the trial court to vacate Curtis's conviction for attempted indecent liberties (count 4).

Curtis also argues the trial court erred when it permitted the State to amend the information and correct language describing the attempted indecent liberties charge after resting its case. Because we remand for the trial court to vacate the attempted indecent liberties conviction on double jeopardy grounds, we do not decide whether the trial court erred in allowing the State to amend the information after resting its case, and we do not consider whether the State presented sufficient evidence to sustain the conviction for attempted indecent liberties.

The trial court need not resentence Curtis on his other convictions on remand. He was serving an 18-month sentence for attempted indecent liberties concurrently with an indeterminate sentence of 65 months to life for indecent liberties with forcible compulsion. Because the trial court ruled that all of Curtis's sex offenses were the same criminal conduct and calculated the applicable sentencing ranges based on an offender score of 1, the standard sentencing ranges for Curtis's other convictions would remain unaffected by vacation of his conviction on count 4.

### III. PROSECUTORIAL MISCONDUCT

To establish prosecutorial misconduct, Curtis must prove that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Because he failed to object to any of the alleged misconduct during trial, Curtis is "deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction

could not have cured the resulting prejudice." *Id.* at 760-61. We review the prosecutor's arguments "'in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given.'" *State v. Thierry*, 190 Wn. App. 680, 689, 360 P.3d 940 (2015) (quoting *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994)).

A.      Personal Opinions

First, Curtis argues the prosecutor personally vouched for the credibility of witnesses and inappropriately expressed his opinions when he "endlessly made first person assertions, thereby telling the jury what he believed." Br. of Appellant at 37. We disagree.

The prosecutor may not express a personal opinion regarding "the credibility of witnesses or the guilt or innocence of the accused." *State v. Calvin*, 176 Wn. App. 1, 19, 316 P.3d 496 (2013). However, they "may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). The prosecutor has "wide latitude to argue reasonable inferences from the facts," such as that details of a victim's testimony have a "'ring of truth.'" *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). Moreover, where a prosecutor's statements beginning with "'I think'" or "'I think the evidence shows'" were supported by the evidence, and a curative instruction could have addressed "any error in the form of the argument," the Washington Supreme Court has declined to hold that the statements constituted reversible misconduct. *State v. Hoffman*, 116 Wn.2d 51, 94, 804 P.2d 577 (1991).

Curtis challenges statements where the prosecutor began with "I would argue" or a similar phrase. The prosecutor generally made these statements while highlighting specific evidence presented at trial. For example, the prosecutor stated, "I would argue we have some of the best evidence in this case showing forcible compulsion," while emphasizing testimony that Curtis

repeatedly forced APV onto her back and bruised her breast. VRP (Jan. 14, 2020) at 499. The prosecutor said, "I would argue that's not credible," when discussing the improbable nature of testimony from one of Curtis's witnesses. *Id.* at 512. And because APV reported that this sexual assault and rape occurred while Curtis's girlfriend and child were in the same bed, the prosecutor stated, "I would argue that because this is so unique and odd and terrible, that it lends credibility and makes sense." *Id.* at 532. The prosecutor is permitted to argue reasonable inferences from the evidence about witness credibility, including that the details of the victim's testimony suggest truthfulness. *See Warren*, 165 Wn.2d at 30. If their statements are supported by the evidence, use of first person pronouns does not undermine the validity of the prosecutor's arguments. *See Hoffman*, 116 Wn.2d at 94.

The prosecutor also said, "I would argue [APV's] life changed forever that day," VRP (Jan. 14, 2020) at 494, and "I would argue sometimes it takes years for someone to come to terms or be willing to deal with the scrutiny that comes when you report and also with knowing what you could do to that person you're reporting about," *id.* at 505. Although these statements were more removed from the evidence presented, neither was inflammatory nor directed at proving Curtis's guilt. Any possible prejudice could have been addressed by a curative instruction. The trial court could have repeated the guidelines already expressed in the jury's instructions, such as, "[t]he evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses and the exhibits that [the court has] admitted during the trial," or "[t]he lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence." CP at

178-79. Any misconduct was easily curable, and Curtis fails to show flagrant and ill-intentioned misconduct.

B.      Using the Word "Gross"

Next, Curtis claims the prosecutor committed misconduct by characterizing Curtis's sexual desire as "gross." We disagree.

The prosecutor stated that the first thing Curtis did was grab APV's breast, and "he knows that's not his wife's breast because they have very different figures, very different sizes. This is important and it's gross and it's awkward to think about, but the Defendant had been with Miranda Lynch for three years. I would argue he was attracted to something different." VRP (Jan. 14, 2020) at 513.

The difference in the women's body types was part of the evidence presented. In context, it is apparent that the prosecutor briefly used the word "gross" to indicate that he empathized with the jury's possible discomfort at comparing the women's bodies or thinking about Curtis's infidelity. He did not imply that Curtis's sexual attraction itself was gross or argue that Curtis was guilty because his sexual preferences were abnormal. The prosecutor was not seeking to appeal to the jury's prejudices; he was attempting to argue that Curtis did not mistakenly or drunkenly believe he was touching his girlfriend. This was not flagrant and ill-intentioned misconduct.

C.      Accountability

Finally, Curtis contends the prosecutor erred when he told the jury not to let him "'get off scot[-]free'" because the jury's job is only "to find facts." Br. of Appellant at 40. Again, we disagree.

22

The prosecutor may not request that the jury "'send a message' or 'protect the community'" because this is "inconsistent with the jury's duty to apply the law to the facts" of the particular case. *State v. McNallie*, 64 Wn. App. 101, 111, 823 P.2d 1122 (1992). Curtis relies on *State v. Ramos*, where the prosecutor urged the jury to convict the defendant of a drug delivery "in order to protect the community from drug dealing." 164 Wn. App. 327, 337, 263 P.3d 1268 (2011). Division One concluded that an instruction could not have cured the prejudice resulting from this and other similar statements because the prosecutor's remarks were "not based on the evidence" and "not isolated." *Id.* at 340. Rather, the community protection argument in *Ramos* was presented as "a prism through which the jury should view the evidence." *Id.*

Here, the prosecutor recalled that in his interview with Buettner, Curtis said, "I shouldn't get off scot[-]free." VRP (Jan. 14, 2020) at 508. The prosecutor then argued, "I urge you to follow the Defendant's advice. Don't let him get off scot[-]free." *Id.* The first person to say these words was Curtis himself, in a video that had already been admitted into evidence and played for the jury. Additionally, the prosecutor's statement was an isolated remark, not a framework for his entire argument. Had Curtis objected, any prejudice would have been curable by an admonishment from the trial court that the jury's role is to determine guilt or innocence based on the law and the evidence presented. Curtis again fails to show flagrant and ill-intentioned misconduct.

D.     Failure to Object

Curtis also argues, "To the extent that this Court holds that the prejudicial effect of the prosecutor's repeated errors could have been obviated by objection and instructions, then Mr. Curtis argues, in the alternative, that it was ineffective assistance to fail to object." Br. of Appellant at 44. "Defense counsel's failure to object to a prosecutor's closing argument will generally not

constitute deficient performance because lawyers 'do not commonly object during closing argument absent egregious misstatements.'" *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 721, 327 P.3d 660 (2014) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 717, 101 P.3d 1 (2004)), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). Although objections to some of the prosecutor's statements could have resulted in curative instructions, none of the statements that Curtis cites was an egregious misstatement that could have affected the outcome at trial. The prosecutor used personal pronouns, but nearly all of his arguments were based on the evidence, and none were inflammatory. The other remarks that Curtis challenges were brief and isolated when considered in the context of the prosecutor's entire argument. Therefore, trial counsel was not deficient for failing to object.

## IV. JUROR MISCONDUCT

Curtis argues the trial court erred when it did not investigate juror misconduct after a "juror appeared biased against Mr. Curtis." Br. of Appellant at 45. We disagree.

A new trial is appropriate only where the defendant shows that juror misconduct prejudiced them. *State v. Earl*, 142 Wn. App. 768, 774, 177 P.3d 132 (2008). If the defendant fails to show either misconduct or prejudice, then the trial court may limit the scope of its inquiry. *Id.* This court has previously determined that a personal remark may not be juror misconduct "if it does not involve the substance of the jury's deliberations." *Id.* at 776. We review the trial court's investigation into alleged juror misconduct for abuse of discretion. *State v. Gaines*, 194 Wn. App. 892, 896, 380 P.3d 540 (2016).

Whether to hold an evidentiary hearing on alleged juror misconduct before ruling on a motion for a new trial is within the trial court's discretion. *State v. Berhe*, 193 Wn.2d 647, 657,

444 P.3d 1172 (2019). Curtis cites to *Berhe* for the proposition that "'as a matter of due process, the trial court should . . . conduct[ ] an evidentiary hearing before ruling on [a] motion for a new trial' to eliminate any 'lingering doubt about whether the defendant had received a fair trial.'" Br. of Appellant at 47 (alterations in original) (internal quotation marks omitted) (quoting *Berhe*, 193 Wn.2d at 660). But *Berhe*'s analysis focused specifically on situations where "a juror's statements during deliberations 'create a clear inference of racial bias.'" 193 Wn.2d at 660 (quoting *State v. Jackson*, 75 Wn. App. 537, 543, 879 P.2d 307 (1994)). *Berhe* advised trial courts to use a more tailored framework to investigate alleged racial bias during deliberations because "racial bias is a common and pervasive evil that causes systemic harm" and is "uniquely difficult to identify." *Id.* at 657. The concerns underlying the Supreme Court's analysis in *Berhe* are not present here.

Here, the alleged misconduct occurred when one of the jurors remarked to Curtis, after the first day of trial, "you're getting blamed for everything else so I may as well blame you for my dog being stuck in the house and not being able to go to the bathroom." CP at 218 (boldface omitted). Even assuming this interaction occurred as Curtis and his mother remembered it, Curtis failed to show how the comment prejudiced him. The juror did not reference either the specific evidence presented or any of Curtis's immutable characteristics, and the juror did not make the comment during deliberations or in front of any other jurors. Although it was inappropriate for the juror to communicate with Curtis, his remark did not demonstrate actual bias sufficient to warrant a new trial. And because there was no indication of racial bias, *Berhe*'s more tailored framework is inapplicable. We hold the trial court did not abuse its discretion when it denied Curtis's motion for a new trial without holding an evidentiary hearing.

V. FUNDING FOR A SSOSA EVALUATION

Finally, Curtis argues the trial court "punished" him "for exercising his right to trial" when it denied his motion to fund a SSOSA evaluation without providing a reason. Br. of Appellant at 48. Curtis contends that because he was statutorily eligible for a SSOSA, his decision to exercise his trial right was "the only possible reason the trial court would deny funding." *Id.* We remand for the trial court to review Curtis's request and explain its reasoning on the record.

The legislature developed a "special sentencing provision for first time sex offenders in an attempt to prevent future crimes and protect society." *State v. Young*, 125 Wn.2d 688, 693, 888 P.2d 142 (1995). Eligibility for a SSOSA is determined by statute. *See* RCW 9.94A.670(2). "If the court finds the offender is eligible for this alternative, the court . . . *may* order an examination to determine whether the offender is amenable to treatment." RCW 9.94A.670(3) (emphasis added); *see also State v. Osman*, 157 Wn.2d 474, 481, 139 P.3d 334 (2006) ("In determining whether a SSOSA is appropriate, the court has discretion to order an examination.").

The trial court also has discretion to authorize the expenditure of public funds for a SSOSA evaluation under CrR 3.1(f). *Young*, 125 Wn.2d at 696-97. Because the legislature "limited the SSOSA option to those defendants found to be amenable to treatment through an initial evaluation," the Supreme Court concluded that when the legislature established SSOSA, it "intended to confer upon trial courts not only the discretion to order the necessary evaluation but to order the expenditure of public funds when the initial evaluation is ordered for an indigent defendant." *Id.* at 695. The Supreme Court reasoned that to "suggest the SSOSA option is only available to those offenders who can afford the initial evaluation, does not give effect to the intent

of the Legislature. Nor is it reasonable to conclude that the Legislature intended to create a special sentencing provision only for sex offenders with personal means." *Id.* at 697.

In this case, the record does not show the trial court's reasons for denying Curtis's request. All we have is Curtis's request to fund an evaluation (after the trial court found him indigent and appointed counsel), a denial of that request, and a remark at the beginning of Curtis's presentence investigation report that because "a Special Sex Offender Sentencing Alternative is not being considered, no psychosexual evaluation or full disclosure polygraph has been ordered." CP at 252. Without any indication of whether the trial court agreed that Curtis was statutorily eligible for a SSOSA sentence, or explanation of why the trial court denied Curtis's request for SSOSA evaluation funding, it is impossible for this court to determine whether the trial court failed to follow the requirements of the Sentencing Reform Act of 1981, chapter 9.94A RCW, or otherwise abused its discretion. We therefore remand for the trial court to articulate on the record whether Curtis is statutorily eligible for a SSOSA sentence and, if so, whether the trial court is ordering funding for a SSOSA evaluation. If the trial court is not ordering a SSOSA evaluation, it should articulate the basis for its decision on the record.

## CONCLUSION

We affirm Curtis's convictions for third degree rape and indecent liberties with forcible compulsion, accept the State's concession, and remand for the trial court to vacate Curtis's conviction for attempted indecent liberties. On remand, the trial court should determine Curtis's eligibility for a SSOSA on the record, as well as whether it is ordering a SSOSA evaluation, and it should provide an explanation of its reasoning.

No. 54359-1-II

Because Curtis's conviction for attempted indecent liberties was deemed to be the same criminal conduct as Curtis's remaining counts, resentencing may not be required. However, the trial court should resentence Curtis if doing so becomes necessary in light of the SSOSA analysis on remand. It should also take the opportunity to correct scrivener's errors related to the numbering of the counts on which Curtis was convicted in the judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Lee, C.J.

Maxa, J.

28